## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| TRINIDAD AND TOBAGO UNIT TRUST CORPORATION, )<br>)<br>)<br>)<br>       Plaintiff, )<br>v. )<br>)<br>CB RICHARD ELLIS, INC. and )<br>KENT S. KERR, )<br>       Defendants. )<br>) | Case Number: _____ |

## COMPLAINT

This is an action seeking money damages for negligent or grossly negligent real estate valuation. Plaintiff, TRINIDAD AND TOBAGO UNIT TRUST CORPORATION, by and through its undersigned counsel, sues Defendants, CB RICHARD ELLIS, INC. and KENT S. KERR, and alleges as follows:

## THE PARTIES

1.     Plaintiff, TRINIDAD AND TOBAGO UNIT TRUST CORPORATION ("UTC"), is a financial services company organized pursuant to statute under the laws of the Republic of Trinidad and Tobago, with its principal place of business in Port of Spain, Trinidad and Tobago. It was established in 1981 for the purposes of mobilizing capital for beneficial investment and of providing investment opportunities for smaller investors.

2.     UTC provides investment services, including mutual funds, and other financial services such as credit and debit card services to individuals, institutions, businesses, and governments in Trinidad and Tobago and elsewhere in the Caribbean region.

3.      UTC also provides merchant banking services and engages in proprietary investments. This action concerns such an investment.

4.      Defendant CB RICHARD ELLIS, INC. ("CBRE") is a Delaware corporation with its principal place of business in Los Angeles, California.  CBRE was formed in 1998 as the result of a merger of the commercial business branch of the Coldwell Banker real estate company and a British company, Richard Ellis International. CBRE holds itself out as "the global leader in real estate services" and calls itself "the world's premier, full-service real estate services company."  CBRE claims to have over 300 offices in over sixty countries.

5.      CBRE does extensive business in Florida and maintains four offices in South Florida, including one office in downtown Miami.  CBRE claims to be "beyond a doubt South Florida's dominant real estate services firm."

6.      Defendant KENT S. KERR ("Kerr") is a real estate professional who, at all times relevant to the allegations of this Complaint, was an employee and a Director of CBRE.  At all times relevant to the allegations of this Complaint, Kerr worked in CBRE's downtown Miami office and held the position of Director of Agency for the Caribbean.  Kerr is either a citizen of the United States or an alien admitted for permanent residence in the United States.  Kerr is domiciled in the State of Florida and lives and works in the Miami-Fort Lauderdale area.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to this Court's alienage jurisdiction, 28 U.S.C. §1332(a)(2), because the amount of controversy exceeds $75,000, exclusive of interest and costs, and the action is between the citizen of a foreign state and citizens of states of the United States.

8.     This Court has personal jurisdiction over Kerr as he is a resident of Florida.  This Court has jurisdiction over CBRE because it regularly and continuously did and continues to do substantial business and maintains and continues to maintain an office or offices within this judicial district and because the acts giving rise to the claims asserted herein took place in this judicial district.   On information and belief, CBRE thus has operated, conducted, engaged in, or carried on a business or business venture in Florida and this judicial district or has an office or agency in Florida and this judicial district.  On information and belief, CBRE also has engaged in substantial and not isolated activity in Florida and this judicial district, including regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Florida and this judicial district.  CBRE also has a registered agent in Florida for the purposes of, *inter alia*, accepting service of process and thus it lacks any objection to this Court's exercise of personal jurisdiction.  CBRE thus is subject to this Court's specific and general personal jurisdiction consistent with due process and the Florida Long Arm Statute, Fla. Stat. §48.193.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a)(1) and (2) because CBRE and Kerr reside within this judicial district, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## STATEMENT OF FACTS

### I. The Dellis Cay Project

10.     UTC was solicited to make loans to, and did make loans to, an entity called Turks Development Limited Partnership ("TDLP") to fund a project for the development of a luxury resort hotel and villa project on the island of Dellis Cay (the "Dellis Cay Project").

11.     The net amount of UTC's loans was approximately $77 Million (all monetary amounts in this Complaint are expressed in United States dollars).   Of this amount, approximately $75.5 Million in principal, and millions more in interest, remains outstanding.

12.     TDLP is insolvent and cannot repay the loans made by UTC.

13.     The Dellis Cay Project was conceived, developed, marketed, publicized, and directed by O Property Collection ("OPC"), a resort property developer with its principal place of business in the United States in Miami, Florida.  Its founder, CEO and majority owner is Cem Kinay, M.D. ("Kinay"), a Turkish national with a residence in Miami Beach, Florida.

14.     Kinay is general partner of TDLP.  At all relevant times, he owned or controlled TDLP and a number of affiliated entities, including Turks Luxury Properties Limited, Turks Limited, Turks BVI Holdings Limited, and Dellis Construction Limited.  These entities were all involved in the Dellis Cay Project.

15.     Dellis Cay is an undeveloped island of approximately 560 acres in the Turks and Caicos Islands ("TCI"), a British overseas territory in the British West Indies.  The Dellis Cay Project contemplated a resort development consisting of a high-end luxury hotel, a marina, and 275 luxury villas and residences.

16.     In 2005, TDLP purchased all the developable land on Dellis Cay for $18 Million.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

17.     The developable land on Dellis Cay amounts to an area of 210.59 acres.  All the remaining land area is subject to environmental protection regulations and cannot be developed.

18.     Accordingly, the 2005 sale price was equivalent to a price of approximately $85,500 per developable acre.

## II. The May 2007 Valuations

19.     In 2007, the now-defunct New York investment bank Bear Stearns became involved with a proposal to arrange for the issuance of secured notes for the funding of the Dellis Cay Project.  The notes were to be issued by Turks Luxury Properties Limited, a subsidiary of TDLP.

20.     The notes were to be secured by a first charge over the land constituting the developable land of Dellis Cay and on all the buildings, improvements, and infrastructure that would be constructed thereon (the "Dellis Cay Property").

21.     In connection with the proposed issuance of the secured notes, CBRE was retained to prepare an appraisal of the Dellis Cay Property.

22.     Kerr had primary responsibility for the preparation of the appraisal.

23.     Defendants were aware that the purpose of the appraisal was to demonstrate to prospective investors the adequacy of the security for the secured notes.

24.     Defendants prepared two appraisals for this purpose.

25.     The first was an unsigned preliminary appraisal dated March 14, 2007, and titled "Preliminary Report" (the "Preliminary Report").  The second was a signed final report dated May 22, 2007, and titled "Valuation Report" (the "Final Report").  The May 14 Preliminary Report assigned a market value to the Dellis Cay property of $82 Million.  The May 22 Final Report assigned a market value of $90 Million.

26.     Both the Preliminary Report and the Final Report assigned values that were grossly in excess of any reasonable appraisal of the actual market value of the Dellis Cay property.

27.     In preparing both the Preliminary Report and the Final Report, Defendants did not act in accordance with professional standards of care.  Instead, they acted in a manner that was reckless and wanting in care.

28.     In preparing both the Preliminary Report and the Final Report, Defendants' actions constituted a conscious disregard and indifference to the rights of persons exposed to its conduct and whom Defendants knew or reasonably expected to know would be relying on its reports.

29.     In preparing both the Preliminary Report and the Final Report, Defendants' actions constituted an intentional misrepresentation of facts that, the Defendants knew, would be presented to potential investors for the purpose of inducing them to invest in the Dellis Cay Project.

30.     Defendants' decision to increase the valuation between the Preliminary Report and the Final Report had no basis in fact, was not taken in accordance with professional standards of care, and constituted a conscious disregard and indifference to the rights of persons exposed to its conduct.

31.     Defendants' decision to increase the valuation between the Preliminary Report and the Final Report had no basis in fact and was an intentional misrepresentation  of material facts that, Defendants knew, would be presented to potential investors for the purpose of inducing them to invest in the Dellis Cay Project.

### A.     The May 14, 2007 Preliminary Report

32.     The Preliminary Report carries a "draft" stamp and states that is "presented to: Dr. Cim [sic] Kinay, TURKS LIMITED."

33.     The Preliminary Report indicates that it was prepared by CB Richard Ellis, Inc. at its offices at 1111 Brickell Avenue, Suite 1750, Miami, Florida 33131.

34.     The Preliminary Report is unsigned but has spaces for the signatures of Kerr and two additional CBRE real estate professionals:  Francis J. Pons ("Pons") and Jorge Hurtado ("Hurtado").

35.     Kerr had primary responsibility for the preparation of the Preliminary Report.

36.     The Preliminary Report states that the "scope of the valuation" is to "[p]rovide a valuation in compliance with International Valuation Standards reflecting professional practice standards for the Turks and Caicos Islands, as well as Uniform Standards of Professional Practice [sic]and Royal Institute [sic] of Chartered Surveyors guidelines."

37.     The International Valuation Standards are promulgated by the International Valuations Standards Council, a non-profit organization whose membership includes associations of appraisers from fifty-two countries.  The International Valuation Standards have widespread recognition internationally as providing ethical and technical standards applicable in all jurisdictions.   The version of the International Valuation Standards relevant to this dispute are the International Valuation Standards, Eighth Edition (2007) (hereafter "IVS").

38.     The Uniform Standards of Professional Appraisal Practice ("USPAP") were developed by a committee of appraisal organizations in the United States and Canada.  They are interpreted and amended by the Appraisal Standards Board, whose members are appointed by the Trustees of The Appraisal Foundation, a non-profit umbrella organization of professional

7

appraisal groups. USPAP is recognized in the United States and elsewhere as providing a widely accepted standard of practice for real estate appraisal.

39.     The guidelines of the Royal Institution of Chartered Surveyors ("RICS") are found in a publication informally known as the "RICS Red Book." These guidelines are internationally recognized as providing a high standard of trustworthiness and reliability in real estate valuation. The relevant version of the RICS Red Book for purposes of this Complaint is the Fifth Edition (2003), formally titled "RICS Appraisal and Valuation Standards."

40.     Kerr, Pons and Hurtado were, at all relevant times, Members of RICS.

41.     RICS has established standards of professional ethics and of professional standards of care applicable to valuations of property in any jurisdiction.

42.     Investors and purchasers of real property in the Caribbean are familiar with RICS and rely upon the RICS certification as an indication that a real estate professional is knowledgeable, competent, and trustworthy, and that he or she will abide by applicable ethical and professional standards of care.

43.     The Preliminary Report was not prepared in compliance with the IVS, the USPAP, or the RICS guidelines.

44.     The Preliminary Report was not prepared in accordance with professional standards of care, and its preparation was done in a manner that was reckless and wanting in care in that it constituted a conscious disregard and indifference to the rights of persons exposed to the conduct of those who prepared it.

45.     The Preliminary Report did not represent a reasonable valuation of the market value of the Dellis Cay property as of May 2007.

46.     Defendants were or should have been aware that the Preliminary Report did not represent a reasonable valuation of the market value of the Dellis Cay property as of May 2007.

47.     The Preliminary Report's valuation of the market value of Dellis Cay property of $82 Million was greatly inflated over any reasonable appraisal of the true market value as of May 2007.

48.     The Preliminary Report constituted an intentional misrepresentation of the value of the Dellis Cay property.

49.     The Preliminary Report had the following deficiencies and errors that led Defendants to arrive at a gross over-valuation of the Dellis Cay property:

    a.  Defendants chose to use the "comparable properties" method in valuing the Dellis Cay property.  Although use of this method is reasonable when comparable sales information is available, it requires the selection of appropriately comparable properties in order to yield a reliable result. Defendants failed to select appropriate comparable properties, such as a sale of a similar 200-acre parcel and, most importantly, the prior sale of the Dellis Cay property itself.

        i.  In the Preliminary Report, Defendants included information regarding the sale of a 200-acre parcel on Water Cay in TCI, which sold for a reported price of $60,000 acre in December 2004, but, without explanation, excluded this property from its "selected comparables" for determining the market value of the Dellis Cay property.

ii. The $60,000 per acre price for the Water Cay property in 2004 is roughly comparable to the price of $85,500 per developable acre for which the Dellis Cay property sold in 2005.

iii. The Preliminary Report also ignored the prior 2005 sale of the Dellis Cay property itself.

iv. It is a principle of property valuation that a prior sale of a subject property, provided it is within a reasonable period of time, is the best indication of current market value.

v. The failure of Defendants to utilize the Water Cay and Dellis Cay sales as comparable properties was not in conformance with IVS, USPAP, or RICS standards and was not in accordance with professional standards of care.

b. Defendants selected, as comparable properties, three properties that were not actually comparable, in that they were much smaller than the Dellis Cay property; they were lots in other established development projects, not raw land sites for entire development projects; and the prices for them were listing prices, not sales prices.

i. The three "selected comparables" were roughly 4, 7.11, and 25 acres in size.

ii. Defendants utilized the current listing prices of these three "selected comparables" as if they were sale prices, and either did not attempt to determine, or ignored, the actual prior sale prices of the three properties.

iii. It is not in accordance with IVS, USPAP, or RICS guidelines to value property by comparison to listings, rather than actual sales, when actual sales information is available.

iv. It is not in accordance with professional standards of care to value property by comparison to listings, rather than actual sales, when actual sales information is available.

v. The actual prior sales prices per acre of the three "selected comparables" were $198,658 per acre for two of the properties (which had been actually sold as a single sale in 2004), and $39,391 per acre (an average of separate sales in June 2002).

vi. The listing prices per acre for the properties were, respectively, $421,940; $562,500; and $600,000. These were much higher than the prior sales prices. Defendants adjusted the listing prices of the three "selected comparables" downward for various factors, and concluded that an average of the "adjusted prices" was $323,295. It "rounded" that figure up $325,000 per developable acre, as a figure that "reasonably represents the Current Market Value of the Subject Property "As Is."

c. In the Preliminary Report, this $325,000 figure was multiplied by 210.59 acres, to arrive at an "as is" valuation of $68.5 Million for the Dellis Cay property.

d. Approximately 16.8 acres were not available for development, having been promised to the seller in 2005 as lots for the seller's use, or being

subject to an easement retained by the seller. Therefore, the actual size of the Dellis Cay property that was available for profitable development was only 193.8 acres. Multiplying the "adjusted price" per acre by 210.59 acres instead of by 193.8 acres was a negligent or grossly negligent error, which was not in accordance with IVS, USPAP, RICS guidelines, or professional standards of care.

e. In the Preliminary Report, Defendants then boosted the $68.5 Million figure by 20 percent to account for the "value added" by the securing of "necessary entitlements and approvals for a development project." Defendants concluded that "the Current Market Value 'As Is' with Entitlements Approved" was $82 Million.

f. The 20 percent "value added" multiplier was not supported by reliable information.

g. Even if such a multiplier could be justified as a general rule, its application was not permissible in this case. Defendants failed to observe that their three "comparable properties" were themselves lots or groups of lots in development projects that already would have received such entitlements and approvals, and therefore that the addition of 20 percent for "value added" by entitlements and approvals represented double counting. The introduction of this erroneous multiplier was not in compliance with IVS, USPAP, or RICS standards, was not accordance with professional standards of care, and constituted reckless conduct that

constituted conscious disregard and indifference to the rights of persons exposed to its conduct.

50. The Preliminary Report was not in compliance with the International Valuation Standards in that it failed to comply with the following provisions, among others:

    a. The IVS Code of Conduct Section 1.0 states that valuations "should be provided by honest and competent Professional Valuers, free of bias or self-interest, whose reports are clear, will not mislead, and will disclose all matter essential to proper understanding of the valuation."

    b. IVS Code of Conduct Section 5.3.4 states that "a Valuer should make diligent inquiries and investigations to assure that the data for analysis in the valuation are correct and can be relied upon."

    c. IVS 1 – Market Value Basis of Valuation, Section 5.1, provides, among other things, that "in performing a Market Value estimate, the Valuer shall: 5.1.1 completely and understandably set forth the valuation in a manner that will not be misleading; 5.1.2 ensure that the estimate of Market Value is based on market-derived data; 5.1.3 ensure that the estimate of Market Value is undertaken using appropriate methods and techniques."

    d. IVS 1 – Market Value Basis of Valuation, Section 5.1.5.6, provides that "in performing a Market Value estimate, the Valuer shall … include a signed Compliance Statement attesting to the Valuer's objectivity, professional contributions, non-bias, non-contingency of professional fees

13

or other compensation, as well as Standards' applicability and other disclosures."

51.     The Preliminary Report was not in compliance with USPAP in that it failed to comply with the following provisions, among others:

a.  USPAP Rule 1-1 provides that an appraiser must "(a) correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal; (b) not commit a substantial error of omission or commission that significantly affects an appraisal; and (c) not render appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results." The comment to section (c) states that "an appraiser must not render appraisal services in a careless or negligent manner" and that an appraiser must "use due diligence and due care."

b.  USPAP Rule 1-4 provides that, "when a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

c.  USPAP Rule 1-5 provides that if an appraiser is developing a market value opinion, the appraiser must, if the information is available, "analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal."

    d. USPAP Rule 2-1 provides that every real property appraisal report must "clearly and accurately set forth the appraisal in a manner that will not be misleading."

52.    The Preliminary Report was not in compliance with RICS guidelines in that it failed to comply with the following provisions, among others:

    a. RICS guidelines require that an appraisal report must "clearly and accurately set out the conclusions of the valuation in a manner that is not ambiguous, misleading or create a false impression."

    b. RICS guidelines require that recent transactions on the property be included in any appraisal report.

    c. RICS guidelines require that valuation reports should include current activity and trends in the relevant market.

53.    CBRE and Kerr supplied the Preliminary Report to Kinay, OPC, and/or TDLP for their review on or shortly after May 14, 2007.

### B.    The May 22, 2007 Final Report

54.    Kinay, OPC, and/or TDLP were not satisfied with the Preliminary Report.

55.    Kinay, OPC, and/or TDLP advised Defendants that a valuation of at least $90 Million would be required immediately to support the issuance of the Bear Stearns secured notes.

56.    Following further communications with OPC and/or TDLP, and, at their request, Defendants increased their valuation of the Site from $82 Million to Kinay's request minimum valuation of $90 Million, as found in the May 2007 Final Report, issued only eight days after the Preliminary Report.

57.     The Final Report is a slightly modified version of the Preliminary Report with a number of changes made apparently for the purpose of boosting the valuation to meet the requested $90 Million figure.

58.     The Final Report states that is "presented to: Dr. Cim [sic] Kinay, TURKS LIMITED."

59.     The Final Report indicates that it was prepared by CB Richard Ellis, Inc., 1111 Brickell Avenue, Miami, Florida 33131.

60.     The Final Report is signed by Kerr, Hurtado and Pons, all of whom were at that time professional employees of CBRE.  On information and belief, Kerr had actual responsibility for the preparation of the Final Report.

61.     The Final Report states that the scope of CBRE's valuation was to "[p]rovide a valuation in compliance with International Valuation Standards reflecting professional practice standards for the Turks and Caicos Islands, as well as Uniform Standards of Professional Practice and Royal Institute [sic] of Chartered Surveyors guidelines."

62.     The Final Report was not performed in compliance with IVS, USPAP, and RICS guidelines, for all the reasons that the Preliminary Report was not in compliance with those standards and guidelines.

63.     In addition, the Final Report was not performed in compliance with IVS, USPAP, and RICS guidelines, for the reason that adjusting an appraisal at the request of a client is a violation of the obligation of an appraiser, as set forth in the guidelines, to act independently, objectively and without bias.

64.     The Final Report was not prepared in accordance with professional standards of care, and its preparation was done in a manner that was reckless and wanting in care in that it

constituted a conscious disregard and indifference to the rights of persons exposed to Defendants' conduct.

65.     The Final Report did not represent a reasonable appraisal of the market value of the Dellis Cay Property.

66.     Defendants were or should have been aware that the Final Report did not represent a reasonable appraisal of the market value of the Dellis Cay Property.

67.     The Final Report constituted an intentional misrepresentation of the value of the Dellis Cay property.

68.     The Final Report carried forward all the errors and deficiencies of the Preliminary Report but added additional errors and deficiencies, as follows:

   a.  Without any additional information to justify the change, the Final Report boosted the "adjusted price per acre" from $325,000 to $340,000, yielding an "as is" valuation of $71.6 Million when multiplied by the (incorrect) acreage figure of 210.59 acres.

   b.  Without justification, CBRE added $400,000 to this value by "rounding" it to $72 Million.

   c.  Without any additional information to justify the change, the Final Report boosted the "added value" component, which should not have been included in any event, from 20 percent to 25 percent.

   d.  Applying this multiplier to the $72 Million "rounded" valuation resulted in a "Current Market Value 'As Is' with Entitlements Improved" of precisely $90 Million.

69.     Defendants knew that the purpose of the Final Report was to persuade investors that the proposed secured notes, to be issued by Bear Stearns, would be backed by adequate security in the form of real property.

70.     Defendants knew that the intent of Bear Stearns, Kinay, OPC, and TDLP was to supply the Final Report to potential purchasers of the secured notes, and knew that such purchasers would rely on the good reputation of CBRE and of its employees, and on the representation that the appraisal was prepared in compliance with IVS, USPAP, and RICS guidelines.

71.     CBRE knew that UTC was a potential purchaser of the Bear Stearns proposed secured notes.

72.     Bear Stearns marketed its proposed notes to UTC and sought to place $30 Million of the notes with UTC.

73.     UTC was provided with a copy of the Final Report for the purpose of inducing it to make a $30 Million investment in the secured notes.

74.     CBRE knew that UTC was being provided with the Final Report and that the Final Report was being used to induce UTC to make a $30 Million investment in the secured notes.

### C.     The 2007 Lot Sales

75.     Shortly after CBRE issued the Final Report, four building lots totaling 4.11 acres at the Dellis Cay property were sold to purchasers. These lots had been projected to be sold for a total of $9,780,000. In fact, they were sold for a total of $3,633,200.

76.     These actual sales prices, if taken as reflective of the true value of the properties, would indicate that the projected sales prices were inflated by over 270 percent.

77.    Kinay and TDLP reported these sales to Defendants and advised that they should be considered "family/friends discounted sales" that did not reflect the market value of the lots.

78.    Defendants had no reasonable basis to rely on Kinay's representation that the sales of the four lots did not reflect the actual market value of the lots for sale at Dellis Cay, or that they reflected prices that were discounted by the 270 percent represented by Kinay and TDLP.

79.    Without performing its own investigation, Defendants accepted Kinay's representation that these sales were not reflective of the market value of the lots at Dellis Cay.

80.    Failure to conduct an independent investigation in order to determine whether the sales should be utilized to value to the property was not in compliance with IVS, USPAP, or RICS guidelines, and was not in accordance with applicable professional standards of care.

### D.      The October 2007 Update

81.    CBRE issued a "land value update" dated October 23, 2007 (the "October 2007 Update").

82.    The October 2007 Update was sent to Kinay.

83.    The October 2007 Update was prepared by Kerr at CBRE's Miami office.

84.    The October 2007 Update did not correct, and carried forward, all the errors of the May 22, 2007 Final Report and the May 14, 2007 Preliminary Report.

85.    In the October 2007 Update, Defendants advised that they had "taken into account the relevant studies and reports that have been undertaken to support the overall development program." On information and belief, Defendants did not take any such studies and reports into account and its statement that it had done so was a misrepresentation.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

86.     In the October 2007 Update, Defendants advised that they had performed a "careful analysis of recent transactions and developments in the marketplace."  On information and belief, Defendants did not perform any such analysis and its statement that it had done so was a misrepresentation.

87.     The October 2007 Update advised that the Dellis Cay property "has experienced significant appreciation (7.5% - 10%) in value as the Turks and Caicos luxury resort-residential market continues to expand and therefore has offset any change in value [due to the sales of the lots] from the previous valuation conducted May 22, 2007."

88.     Defendants concluded that the removal of four lots totaling 4.11 acres from the area of the Dellis Cay property owned by Kinay and TDLP had no effect on its overall value.

89.     Defendants' assertion that property in the TCI luxury resort-residential market had appreciated by 7.5 percent to 10 percent in the five months between May and October 2007 was incorrect and was not based on any reliable information.

90.     During 2007, the TCI luxury resort-residential market had begun to contract as a result of the onset of the worldwide economic crisis, and by October 2007 sales of luxury properties in TCI and in other Caribbean markets had slowed significantly.

91.     On information and belief, Defendants did not undertake to determine whether, in the five months that had passed since the Final Report, any of the comparables utilized in the Final Report had sold.  In fact, none had sold.

92.     On information and belief, Defendants did not undertake to determine whether, in the five months that had passed since the Final Report, there had been any other sales that could be used as comparables.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

93.     Because it was represented to be an "update" to the Final Report, the October 2007 Update contained an implicit representation that it was conducted in compliance with IVS, USPAP, and RICS guidelines.

94.     Defendants knew that their Final Report and their October 2007 Update would be shown to UTC for the purpose of inducing it to invest in the Project.

95.     Defendants' preparation of the October 2007 Update to the Final Report without undertaking any additional investigation into market conditions was not in compliance with IVS, USPAP, or RICS guidelines, and was not in accordance with applicable professional standards of care.

96.     Preparation of the October 2007 Update was conducted in a manner that was reckless and wanting in care in that it constituted a conscious disregard and indifference to the rights of persons exposed to its conduct.

97.     The October 2007 Update constituted an intentional misrepresentation of the value of the Dellis Cay property.

### E.      UTC's October and December 2007 Bridge Loans

98.     Because of delays in Bear Stearns' progress in arranging for the issuance of the secured notes, TDLP requested a $10 Million bridge loan from UTC, which was intended to provide funding sufficient to keep the project on track.

99.     In late October 2007, in justifiable reliance on the Final Report and the October 2007 Update, UTC made a bridge loan of $10 Million to TDLP.

100.    If Defendants had provided valuations of the Dellis Cay Property performed in compliance with IVS, USPAP, and RICS guidelines, and in accordance with applicable professional standards of care, UTC would not have made the bridge loan.

101.   If Defendants had not intentionally provided inaccurate valuations of the Dellis Cay Property, UTC would not have made the bridge loan.

102.   In December 2007, after further delays in the issuance of the notes, UTC was asked to and did provide an additional $6 Million in bridge financing, bringing the total amount of the bridge loan to $16 Million, in anticipation of concluding its $30 Million participation in the secured notes.

103.   In making the decision to provide the bridge financing. UTC reasonably relied on the Final Report and on the October 2007 Update, in which it placed its trust based on the representations of the Defendants that the Final Report and the October 2007 Update were in compliance with IVS, USPAP, and RICS guidelines; the reputation of CBRE; and the RICS certifications of the appraisers.

104.   If Defendants had provided valuations of the Dellis Cay Property performed in accordance with applicable professional standards of care, UTC would not have provided the additional financing.

105.   If Defendants had not intentionally provided inaccurate valuations of the Dellis Cay Property, UTC would not have provided the additional financing.

**F.     The June 2008 Update and UTC's Direct Investment of $62 Million**

106.   In early 2008, Bear Stearns collapsed and ceased doing business.

107.   With the collapse of Bear Stearns, it became clear that the secured notes would never be issued.

108.   Thereafter, TDLP and/or OPC approached UTC to discuss the prospect of UTC becoming the sole or principal financier of the Dellis Cay Project via direct lending.

147.    The June 2008 Update constituted an intentional misrepresentation of the value of the Dellis Cay property.

### G.    The January 2009 Update and Additional Funding

148.    By the end of 2008, Kinay, OPC and/or TDLP were in need of additional funding.

149.    Because UTC's prior loan was at the lower bound of its margin requirement, Kinay, OPC, and/or TDLP needed a new and higher valuation in order to persuade UTC to provide additional funding.

150.    At the end of 2008, Kinay, OPC and/or TDLP urgently asked CBRE for yet another "update" that would show a further increase in market value.

151.    Accordingly, Kerr and CBRE prepared a new "Update" dated January 4, 2009 (the January 2009 Update.)   They did so knowing that TDLP intended to use it to induce UTC to make a further investment in the Dellis Cay Project, and intending that it be used for that purpose.

152.    The January 2009 Update was prepared at CBRE's Miami office and sent from that office to Kinay.

153.    Defendants did not undertake to determine whether, in the eighteen months that had passed since the Final Report, any of the comparables utilized in the Final Report had sold. In fact, none had sold.

154.    Defendants did not undertake to determine whether, in the eighteen months that had passed since the Final Report, there had been any other sales that could be used as comparables.

155.    In the January 2009 Update, Defendants advised that they had "taken into account the relevant studies and reports that have been undertaken to support the overall development

Astigarraga Davis Mullins & Grossman, P.A.

program." On information and belief, Defendants did not take any such studies and reports into account and the statement that they had done so was a misrepresentation.

156.   In the January 2009 Update, Defendants advised that they had performed a "careful analysis of recent transactions and developments in the marketplace." On information and belief, Defendants did not perform any such analysis and the statement that they had done so was a misrepresentation.

157.   Defendants' issuance of an "update" to the Final Report without undertaking any additional investigation into then-current market conditions was not in accordance with professional standards of care and its preparation was conducted in a manner that was reckless and wanting in care in that it constituted a conscious disregard and indifference to the rights of UTC.

158.   The January 2009 Update concluded that the Dellis Cay Property was worth $138 Million.

159.   The January 2009 Update is identical to the June 2008 Update with the addition of $29 Million in value for unspecified "horizontal improvements."

160.   Thus, the January 2009 Update perpetuated all the errors and deficiencies of the Final Report and of the subsequent "updates."

161.   On information and belief, prior to issuing the January 2009 Update, CBRE did not make an independent inspection of the Dellis Cay Property, and simply relied on representations from the developer from which it had purchased certain supplies and equipment.

162.   As of January 2009, the Dells Cay Property had no "horizontal improvements" that might add value in the range of $29 Million.

163.    CBRE's inclusion of $29 Million in unspecified "horizontal improvements" without an independent investigation was not in compliance with IVS, USPAP, and RICS guidelines and was not in accordance with applicable professional standards.

164.    In the January 2009 Update, Defendants advised that they had "taken into account the relevant studies and reports that have been undertaken to support the overall development program." Upon information and belief, Defendants did not take any such studies and reports into account and the statement that they had done so was a misrepresentation.

165.    In the January 2009 Update, Defendants advised that they had performed a "careful analysis of recent transactions and developments in the marketplace." Upon information and belief, Defendants did not perform any such analysis and the statement that they had done so was a misrepresentation.

166.    Although additional lots had sold in the six months since the June 2008 Update, the value of these lots was not removed from the valuation of the total property. The January 2009 Update provided no explanation for the failure to deduct the value of these lots from the overall valuation. Nor, were the sales prices used to provide another source of information for the valuation of the property.

167.    Actual trends in the market value of luxury vacation property in the Caribbean over the period June 2008 to January 2009 were negative, as a result of the global financial crisis.

168.    The January 2009 Update significantly over-valued the Dellis Cay property.

169.    Defendants knew and intended that the January 2009 Update would be provided to UTC and that UTC would rely on it in deciding whether to extend further loan financing for the project.

170.    In justifiable reliance on the January 2009 Update, all previous updates, and the Final Report, UTC provided additional funds in the form of secured loans, bringing the total principal loan amount to approximately $70 Million.

171.    If the January 2009 Update had been an accurate valuation, the margin for the additional loans would have been 97 percent, close to the 100 percent margin that was the UTC's benchmark for real estate loans.

172.    The January 2009 Update was not prepared in compliance with IVS, USPAP, or RICS guidelines.

173.    The January 2009 Update was not prepared in accordance with professional standards of care, and its preparation was done in a manner that was reckless and wanting in care in that it constituted a conscious disregard and indifference to the rights of UTC.

174.    The January 2009 Update constituted an intentional misrepresentation of the value of the Dellis Cay property.

175.    UTC would not have made the additional loans if Defendants had not provided the January 2009 Update.


**H.      The Harm to UTC**

176.    In October 2009 the Dellis Cay Project went into receivership and all construction on the project ceased.

177.    UTC's loans to finance the Dellis Cay Project are in default.

178.    The value of the Dellis Cay property is today, and at all relevant times has been, less than the outstanding balance on the loans.

179.    UTC expects to suffer significant losses due to the lack of sufficient security for the loans it made for the Dellis Cay Project.

180.    UTC would not have suffered these losses had Defendants prepared and provided valuations that met generally accepted standards of care applicable to commercial real property appraisal.

181.    Defendants did not comply with IVS, USPAP, or RICS guidelines in the preparation of the Final Report or of any of the October 2007, June 2008, or January 2009 "Updates."

182.    Defendants' preparation of the Final Report and the October 2007, June 2008, and January 2009 "Updates" was done in a manner that was reckless and wanting in care in that it constituted a conscious disregard and indifference to the rights of UTC.

183.    Defendants violated professional ethical standards in the preparation of the Final Report and each of the October 2007, June 2008, and January 2009 Updates and the provision of those documents to Kinay, OPC, and/or TDLP.

184.    In the Final Report and the October 2007, June 2008, and January 2009 "Updates," Defendants intentionally made material misrepresentations of fact regarding the value of the Dellis Cay property and the reliability of their appraisals thereof, for the purpose of inducing UTC to make investments in the Dellis Cay Project.

## COUNT I

### (Negligent Misrepresentation)

185.    Plaintiff incorporates paragraphs 1- 184 above as though fully set forth herein.

186.    CBRE holds itself out as a professional organization with skill, experience and ethical integrity in the valuation of resort property in the Caribbean in accordance with applicable professional standards.

187.    Kerr held himself out as having the skill, experience, training, and ethical integrity necessary to perform reliable valuations of the market value of resort property in TCI in accordance with applicable professional standards.

188.    Defendants prepared a series of valuations of the Dellis Cay Property with the knowledge that each of them was for the purpose of inducing UTC, and which did induce UTC, to make loans secured by the Dellis Cay Property for the purpose of the development of the Property.

189.    In the Final Report, Defendants expressly represented that they had complied with IVS, USPAP, and RICS guidelines, yet they had not done so.

190.    In each Update, Defendants implicitly represented that they had complied with IVS, USPAP, and RICS standards, yet they had not done so.

191.    In each Update Defendants represented that they had "taken into account the relevant studies and reports that have been undertaken to support the overall development program," yet they had not done so.

192.    In each Update, Defendants represented that they had reached their conclusions after "careful analysis of recent transactions and developments in the marketplace," yet they had not performed any such analysis.

193.    UTC reasonably relied on each of the valuations prepared by Defendants.

194.    Defendants negligently misrepresented the scope and nature of their work in preparing the valuations in the knowledge and with the intent that their work would be provided to UTC and would be relied upon by UTC.

195.    Defendants negligently provided inaccurate information regarding the market value of the Dellis Cay Property in the knowledge and with the intent that the information would be provided to UTC and would be relied upon by UTC.

196.    Defendants repeatedly failed to exercise reasonable care and competence in obtaining, developing, and communicating information about the market value of the Dellis Cay Property.

197.    Defendants negligently failed to meet their professional and ethical obligations to perform accurate appraisals and instead acted to meet the expectations of Kinay, OPC and/or TDLP.

198.    As of the dates of each valuation, Defendants were in possession of information that would have led a reasonably skilled appraiser in the exercise of due care to conclude that the appraised market values reported by Defendants were substantially inflated over the values that an appraisal conducted in accordance with professional standards of care would have reached.

199.    UTC reasonably relied on the CBRE valuations in deciding to make a series of loans, with a net outstanding principal of approximately $75.5 Million, to finance the Dellis Cay Project.

200.    As a direct and proximate result of Defendants' negligent misrepresentations regarding the scope of their work and the market value of the Dellis Cay Property, UTC has

suffered substantial damages which have not yet been fully determined but which are expected to be in excess of $50 Million.

201.   Wherefore, UTC requests a judgment against Defendants CBRE and Kerr, jointly and severally, in an amount to be determined at trial, of not less than $50 Million, together with counsel fees, interest, cost of bringing suit, and all other relief deemed appropriate by this Court.

**COUNT II**

**(Professional Negligence)**

202.   Plaintiff incorporates paragraphs 1-201 above as though fully set forth herein.

203.   Defendants owed a duty of care to UTC in valuing the Dellis Cay Project.

204.   Defendants breached the applicable standards of care including without limitation the standards established by the IVS, the USPAP and the RICS guidelines.

205.   As a direct and proximate result of Defendants' actions, UTC has suffered substantial damages that have not yet been fully determined but which are expected to be in excess of $50 million.

206.   Wherefore, UTC requests a judgment against Defendants CBRE and Kerr, jointly and severally, in an amount to be determined at trial, of not less than $50 Million, together with counsel fees, interest, costs of bringing suit, and all other relief deemed appropriate by this Court.

**COUNT III**

**(Gross Negligence)**

207.   Plaintiff incorporates paragraphs 1-206 above as though fully set forth herein.

208.   Defendants owed a duty of care to UTC in valuing the Dellis Cay Project.

35

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

209.     Defendants' actions were reckless and wanting in care in that they constituted a conscious disregard and indifference to the rights of UTC.

210.     As a direct and proximate result of Defendants' actions, UTC suffered damages which have not yet been fully determined but which are expected to be in excess of $50 Million, exclusive of any return on its investments.

211.     Wherefore, UTC requests a judgment against CBRE and Kerr, and each of them, jointly and severally, in an amount to be determined at trial, of not less than $50 Million, together with counsel fees, interest, costs of bringing suit, and all other relief deemed appropriate by this Court.

## COUNT IV

### (Fraudulent Misrepresentation)

212.     Plaintiff incorporates paragraphs 1- 211 above as though fully set forth herein.

213.     CBRE is a professional organization with skill and experience in the valuation of real property, including resort property in the Caribbean, in accordance with applicable professional standards.

214.     Kerr is an individual with the skill, experience and training necessary to perform reliable valuations of the market value of resort property in TCI in accordance with applicable professional standards.

215.     In the Final Report, Defendants represented that they had complied with IVS, USPAP, and RICS guidelines, with the knowledge that they had not done so.

216.     In each Update, Defendants adopted the prior representation that they had complied with IVS, USPAP, and RICS standards, with the knowledge that they had not done so.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

217.    In each Update, Defendants represented that they had "taken into account the relevant studies and reports that have been undertaken to support the overall development program, with the knowledge that they had not done so.

218.    In each Update, Defendants represented that they had reached their conclusions after "careful analysis of recent transactions and developments in the marketplace," with the knowledge that they had not done so.

219.    Defendants intentionally misrepresented the scope and nature of their work in preparing the valuations in the knowledge and with the intent that these misrepresentations would induce UTC to rely on their valuations.

220.    Defendants intentionally provided inaccurate information regarding the market value of the Dellis Cay Property in the knowledge and with the intent that the information would be provided to UTC and would be relied upon by UTC.

221.    Defendants intentionally failed to meet their professional and ethical obligations to perform accurate appraisals and instead acted to meet the expectations of Kinay, OPC and/or TDLP.

222.    As of the dates of each valuation, Defendants were in possession of information that, given their level of skill and expertise, must have led them to conclude that the appraised market values reported by Defendants were substantially inflated over the values that an appraisal conducted in accordance with professional standards of care would have reached.

223.    UTC relied on the CBRE valuations in deciding to make a series of loans, with a net outstanding principal of approximately $75.5 Million, to finance the Dellis Cay Project.

224.    As a direct and proximate result of Defendants' intentional misrepresentations regarding the scope of their work and the market value of the Dellis Cay Property, UTC has

suffered substantial damages which have not yet been fully determined but which are expected to be in excess of $50 Million.

225.    Wherefore, UTC requests a judgment against Defendants CBRE and Kerr, jointly and severally, in an amount to be determined at trial, of not less than $50 Million, together with counsel fees, interest, cost of bringing suit, and all other relief deemed appropriate by this Court.

### PRAYER FOR RELIEF

226.    Wherefore, UTC requests a judgment against Defendants CBRE and Kerr, and each of them, for:

    (i)   compensatory damages, in an amount to be determined at trial, being no less than $50 Million;

    (ii)  punitive damages, in an amount to be determined by the Court;

    (iii)  interest, counsel fees, and costs of bringing suit;

    (iv)  and all other relief deemed appropriate by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff, TRINIDAD AND TOBAGO UNIT TRUST CORPORATION, hereby demands trial by jury of all issues so triable as a matter of law.

Dated:  January 4, 2011

Respectfully submitted,

ASTIGARRAGA DAVIS MULLINS
  & GROSSMAN, P.A.
701 Brickell Avenue
16th Floor
Miami, Florida  33131
Telephone: (305) 372-8282
Facsimile:  (305) 372-8202

By:     /s/ Edward M. Mullins
Edward H. Davis, Jr. (Fla. Bar No. 704539)
E-Mail:  edavis@astidavis.com
Edward M. Mullins (FL Bar No. 863920)
E-Mail:  emullins@astidavis.com
Douglas J. Giuliano
E-Mail:  dgiuliano@astidavis.com

*Local Counsel for Plaintiff Trinidad and
  Tobago Unit Trust Corporation*

- and -

Eric L. Lewis*
Joseph L. Ruby*
Aisha E. Henry*
BAACH ROBINSON & LEWIS PLLC
1201 F Street, NW
Suite 500
Washington, DC  20004
Telephone:  (202) 833-8900
Facsimile:  (202) 466-5738
*Pro hac vice applications to be filed*

*Lead Counsel for Plaintiff Trinidad and
  Tobago Unit Trust Corporation*